IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


MELISSA TITUS,                          :

        Plaintiff,                  :
                                 Case No. 3:10-cv-469
        vs.                         :
                                 JUDGE WALTER HERBERT RICE
VERIZON WIRELESS, et al.,                :

        Defendants                  :

---

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN
PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC.
#47); CONFERENCE CALL SET

---

Plaintiff Melissa Titus filed suit against her employer, Verizon Wireless ("Verizon"), and one of her former supervisors, Luke Holley ("Holley"), alleging federal and state claims of race and gender discrimination, hostile work environment and retaliation.  This matter is currently before the Court on Defendants' Motion for Summary Judgment.  Doc. #47.  For the reasons stated below, the Court sustains that motion with respect to the claims of discrimination and retaliation, but finds that genuine issues of material fact preclude summary judgment on Titus's claim of a racially hostile work environment.

## I.    Background and Procedural History[1]

Melissa Titus, an African-American female, has been employed by Verizon as a Retail Sales Representative ("RSR") since 2006.  She first worked at a Verizon store in New York and then, in November of 2007, she transferred to the Beavercreek, Ohio, outlet.  She and Lakesha Meadors were the only African-American female employees at the Beavercreek location.  Defendant Luke Holley was an Assistant Retail Sales Manager ("ARM") there from February of 2009 through June of 2009.  Ryan Favor was the Retail Sales Manager.  In July of 2009, Titus transferred to the Centerville, Ohio, store, where she continues to work as a RSR.

Verizon's RSRs are required to meet certain monthly sales goals based on Key Performance Indicators ("KPIs").  Failure to attain these goals may lead to the issuance of a Performance Improvement Plan ("PIP").  The PIPs follow four stages of progression – a Verbal PIP, a Written PIP, a Final PIP, and ultimately, Termination.  A Verbal PIP generally stays on an employee's record for six months; Written PIPs and Final PIPs remain active for one year.  Schultz Decl. ¶¶ 7, 11. Verbal PIPs do not affect an employee's eligibility for promotions.  Although it is preferable that an employee seeking a promotion not have a Written PIP, Written PIPs do not completely bar an employee from applying for a promotion or from approaching management about making an exception to this rule.  *Id.* at ¶ 15.

---

[1] As required on a motion for summary judgment, the Court views the facts and inferences drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Titus alleges that while employed at the Beavercreek and Centerville stores, she has been treated less favorably and disciplined more harshly than similarly situated white, male RSRs and has been unfairly denied promotional opportunities.  According to Titus, Holley discouraged coworkers from interacting with her at the Beavercreek store.  Titus Dep. at 592-95.  He told Meadors that if she wanted to get ahead at Verizon, she should not hang around with Titus.  Meadors Aff. ¶ 15.  Later, when Titus transferred to the Centerville outlet, store manager Shaun Wightman told her that she came with a bad reputation.  Titus Dep. at 581-2.     Titus alleges that she has been placed at a competitive disadvantage, resulting in lower sales figures.  She alleges that Verizon managers often funnel the "good traffic," *i.e.*, customers poised to make a purchase, to the white male RSRs earmarked for promotions, while directing the "bad traffic," *i.e.*, customers needing assistance with returns and billing issues, to her.  Titus Dep. at 651-77.  She also alleges that she is usually assigned to unfavorable work stations near the back of the store where she has fewer opportunities to interact with customers.  *Id.* at 511.[2]

In addition, Titus maintains that, at the Beavercreek store, Holley regularly pulled her off the sales floor for "coaching" sessions, thereby depriving her of time with customers.  According to Titus, although coaching should offer an opportunity for constructive criticism, the "coaching" she received tended to be disciplinary and harassing in nature.  *Id.* at 166-72, 365-67.

---

[2] In support of this statement, Plaintiff's counsel also cites to Titus's affidavit. However, as Defendants note in their Response to Plaintiff's Surreply to Defendants' Reply to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, Doc. #98, at 8 n.8, Titus's affidavit has never been filed with the Court.

On a few occasions, her sales and those of one other African-American employee were attributed to another store outside her district. Although she was paid commission for these sales, they were not initially counted toward her KPI score, thereby negatively affecting her evaluations. *Id.* at 174-75, 454.

Titus maintains that she has repeatedly expressed an interest in participating in Verizon's management training program but, despite her lengthy tenure as a RSR, she has not been invited to participate. Nor has she been assigned more than one Champion Role, an informal unpaid leadership position within the store, or trusted with other leadership roles. When the regular store manager is temporarily unavailable, he or she gives another employee a computer code to assist in resolving customer escalation problems. Titus alleges that, even though she has been there longer than many of the white employees, the managers have not shared these codes with her. *Id.* at 379, 511-12.

Titus further maintains that she has been unfairly disciplined, and that this has affected her advancement opportunities. She received a Verbal PIP in February of 2009 for failing to meet certain KPIs. Shortly thereafter, she had foot surgery and was off work for several weeks.[3] She was issued a Written PIP in May of 2009, again for failing to meet certain KPIs.[4] *Id.* at 174, 178-80, 211-12. Titus maintains that several white, male RSRs with KPIs similar to hers, including Jay Reynolds, Rodney Hines,

---

[3] While Titus was still in the hospital recovering from foot surgery, Ryan Favor texted her and left "nasty" voice mail messages telling her that she needed to clear her voicemail. Titus Dep. at 379.

[4] Titus's quota was pro-rated because of her medical leave.

4

Sean Hall, Will Maples, and John Slack, were not given PIPs. *Id.* at 506.

On the same date Titus received her Written PIP, Lakesha Meadors received a Verbal PIP for failing to meet certain KPIs. Meadors Aff. ¶ 2. Three African-American male technicians had allegedly been disciplined the previous day. Titus Dep. at 346. Around this same time, Jeanette Barnes, a Senior RSR ("SRSR") at the Beavercreek store, told Meadors about a meeting she attended with Luke Holley and Nick Lamont. At that meeting, Holley asked who they needed to get off the team. Lamont suggested Titus and Meadors, and Holley agreed. Barnes objected, pointing out that Titus's sales figures were among the highest in the store. Holley, however, said that Titus and Meadors "did not fit with the team." He then told Barnes that if she wanted to get into management, she would have to support him on this issue. Barnes asked Meadors not to tell Holley that she told Meadors about his comments. Meadors Aff. at ¶ 7.

Meadors did, however, tell Titus, and they immediately requested a meeting with Ryan Favor to voice their concerns. They asked him why Verizon was trying to get rid of them. Meadors stated, "We are the only two African-American women in the store, why do we need to be off the team?" Favor assured them that no one was trying to get rid of them. Meadors and Titus, however, pointed out that they had each recently received a PIP, and three African-American technicians had also just been disciplined.[5] They complained to Favor that they did not receive any warm business leads from the

_____

[5] Defendants note that Titus and Meadors were not privy to disciplinary matters or personnel decisions regarding these technicians, who were independent contractors. Schultz Sec. Supp. Decl. ¶ 10. Defendants maintain that Titus and Meadors lacked personal knowledge and these allegations are based solely on speculation or hearsay. The statements, however, are not offered for the truth of the matter asserted, but rather to add credence to their belief that Defendants harbored a racial animus.

managers and were coached more frequently than other RSRs.  Favor then asked

Holley, Lamont and Barnes to join the meeting.  Although Holley denied making the

statements at issue, Meadors and Titus later overheard him yelling at Barnes, calling

her a traitor, and asking "why the fuck did you tell them what I said?"  Meadors Aff. at

¶¶ 9-10; Titus Dep. at 341-359.

A few weeks later, Holley brought in Verizon's Data Sales Consultant, Kelly

Wingham, to coach Titus and Meadors on mobile broadband sales.  Titus contends that

he did this to retaliate against them for reporting his comments to Favor.  Holley

allegedly told Wingham that they were "holding the team down."  Titus Dep. at 280.  A

couple of months later, Titus, along with several coworkers, was also ordered to attend

"Data University" to improve her data sales.

On one occasion in 2009, because they had attended an early morning store

meeting, Titus, Barnes, and Mark Suchedina, another white sales representative, were

late starting their shift.  Titus was marked "tardy," but the others were not.  *Id.* at 383-85.

In July of 2009, frustrated with the ongoing unfair treatment at the Beavercreek store,

Titus asked to be transferred to Verizon's Centerville, Ohio, location.

On January 19, 2010, Titus filed a complaint with the Equal Employment

Opportunity Commission ("EEOC"), alleging race and gender discrimination.  On

January 21, 2010, she met with Andy Schultz, Verizon's District Manager.  She told him

that she did not believe that her PIPs were warranted, and complained that she was

being coached far more than other RSRs.

Schultz admits that Titus complained about unfair treatment, but denies that she

claimed that it was based on her race or her gender.  She told Schultz about the

6

meeting with Favor, Holley, Barnes, Lamont, and Meadors.  Schultz found no fault with how Favor and Holley had handled the situation.  Titus asked Schultz about the effect of the PIPs on her eligibility to be promoted.  He explained that she was still eligible, but that typically someone who is on a Written PIP is not considered to be qualified for promotion.  Schultz Decl. ¶ 20; Attachment 3 to Schultz Decl.

In February of 2010, Titus applied and interviewed for a lateral position as a Business Accounts Apprentice, but was not selected for the job.  In September of that year, an opening was posted for a Senior RSR at the Beavercreek store.  Titus did not apply only because, based on her negative past experiences there, she did not want to return to that particular store.  After interviewing several candidates, all white males, the district managers discovered that they had a greater need for a Senior RSR at the Centerville store, where Titus is currently employed.  Schultz Decl. ¶ 25.  Titus maintains that Verizon purposely posted the opening at the Beavercreek store to dissuade her from applying for it.

In August of 2011, Titus applied for a promotion to a Senior RSR at another store, and was granted an interview.  However, within days of submitting her application, she received another Verbal PIP.  It was rescinded on September 6, 2011, after Verizon discovered that it had miscalculated her KPI average.  Nevertheless, Titus maintains that it played a part in Verizon's decision not to promote her.  She further argues, however, that Nick Butler, a white male, was pre-selected for the position.

After receiving her right-to-sue letter from the EEOC, Titus filed suit in the Montgomery County Court of Common Pleas, bringing federal and state claims of race and gender discrimination, retaliation and hostile work environment.  On September 27,

2011, Titus filed a second charge of discrimination with the EEOC, alleging a continuation of race and gender discrimination, along with retaliation.   Defendants removed the case to federal court and have now moved for summary judgment.  After that motion was fully briefed, Titus sought and was granted leave to file a sur-reply. Defendants then filed a response.

In a supplement to her memorandum in opposition to Defendants' summary judgment motion, Titus alleges that on April 18, 2012, in the Centerville store, Holley walked directly toward her in a "strutting, arrogant manner," diverting his course at the last minute to greet an assistant manager with the phrase "What up dawg?"  Titus alleges that this was denigrating and upsetting to her as a black woman.  Titus 4/9/12 Aff. ¶ 6.


## II.    Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible;

rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990); *see also L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc.*, 9 F.3d 561 (7th Cir. 1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992), *cert. denied*, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."). If it so chooses, however, the court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).


## III.    Analysis

Titus has alleged race and gender discrimination, a hostile work environment, and retaliation in violation of federal and state law.


### A.    Relevant Law

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "discriminate against any individual . . . with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color,

religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In addition to protecting against discrete acts of discrimination, this subsection of Title VII also protects against discriminatory conduct that creates an intimidating, offensive or hostile working environment. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65-66 (1986). Another subsection of Title VII prohibits an employer from retaliating against an employee because that person has opposed discriminatory employment practices. *See* 42 U.S.C. § 2000e-3(a).

Ohio Revised Code Chapter 4112 contains similar provisions prohibiting discrimination and retaliation. *See* Ohio Rev. Code § 4112.02(A) and (I). Federal case law interpreting Title VII is generally applicable to claims brought under Ohio Revised Code Chapter 4112. *See Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 575 N.E.2d 1164 (Ohio 1991). The Court will, therefore, evaluate these claims together. As Titus correctly notes, Holley cannot be held individually liable under Title VII, *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997), but he can be held individually liable under Chapter 4112, *Genaro v. Cent. Transp., Inc.*, 703 N.E.2d 782, 785 (Ohio 1999).

In an employment discrimination case, a plaintiff may withstand summary judgment in one of two ways. First, the plaintiff may present direct evidence of discrimination or retaliation. Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). For example, a facially discriminatory employment

11

policy or an express statement by a decision-maker of a desire to terminate employees because they are members of a protected class would constitute direct evidence of discrimination. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Absent direct evidence, the plaintiff may withstand summary judgment by presenting sufficient circumstantial evidence from which a reasonable jury could infer a discriminatory or retaliatory motive. In such cases, the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), applies. *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 587-88 (6th Cir. 2009).

The plaintiff must first establish a prima facie case, the elements of which vary slightly depending on the theory asserted. If the plaintiff can establish a prima facie case, an inference of discrimination or retaliation arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory or non-retaliatory reason for the adverse employment action. If the employer articulates such a reason, the presumption of discrimination or retaliation drops away. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000). The plaintiff must then prove, by a preponderance of the evidence, that the proffered reason was pretextual. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The plaintiff may prove pretext by showing that: (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate the adverse employment action; or (3) the proffered reason was insufficient to motivate the adverse employment action. *See Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 471-72 (6th Cir. 2002).

12

With this legal framework in mind, the Court turns first to Titus's claims of race and gender discrimination.

### B.    Race and Gender Discrimination

Counts I of Titus's Complaint alleges race and gender discrimination in violation of Title VII and Ohio Revised Code Chapter 4112.

#### 1.    Direct Evidence

Titus maintains that she has direct evidence of discrimination in the form of Luke Holley's statement to Lamont and Barnes that Titus and Meadors should be terminated because they "did not fit with the team."[6]  Since Titus and Meadors were the only two female African-American employees at the Beavercreek store, it could certainly be *inferred* that Holley meant that they did not fit in because of their race or possibly their gender.  Nevertheless, no such inference is *required*.  Holley could have also meant that they did not fit with the team for any number of other non-discriminatory reasons,

---

[6] The Court rejects Verizon's argument that Holley's statement, as recounted by Jeanette Barnes to Lakesha Meadors, is inadmissible double hearsay.  Both layers fall within the hearsay exclusion set forth in Federal Rule of Evidence 801(d)(2)(D) for statements offered against an opposing party if "made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  Here, the statements are being offered against Verizon and Holley.  Holley's statement to Barnes, and Barnes' statement to Meadors, were both made by Verizon's employees on a matter within the scope of that relationship and while it existed.  Holley, as the ARM, was charged with overseeing the RSRs.  Schultz Decl. ¶ 5.  His statement about who should be on the team clearly falls within the scope of his job as their supervisor. Barnes, as a SRSR, was charged with "coaching" the RSRs.  *Id.*  Defendants note that SRSRs are not considered to be part of the management.  Schultz Sec. Supp. Decl. ¶ 11.  This, however, is not dispositive.  As Meadors' "coach," charged with fostering her success, she was acting within the scope of her job duties when she warned Meadors to "watch [her] back" because Holley did not think that she or Titus "fit with the team." Meadors Aff. ¶ 7.

13

*i.e.*, because their KPIs were lower than those of the other RSRs or because of personality conflicts with coworkers.  Therefore, Holley's statement does not constitute direct evidence of discrimination.

As additional "direct" evidence of discrimination, Titus points to statistics, produced by Defendants, showing how few African-American females hold management positions in Verizon's sales district where the Beavercreek and Centerville stores are located.  She maintains that there is a culture of discrimination in that district, and maintains that of 88 management- level promotions, only one African-American male was promoted and he was terminated after just six weeks.  She also points to hiring statistics showing how few African-American females have been hired.  Although such evidence may be useful to support a claim of pretext, again, it does not require the conclusion that Titus was discriminated against on the basis of her race or gender. Standing alone, these statistics are insufficient to withstand the motion for summary judgment.

### 2.    Circumstantial Evidence

Because Titus has not presented direct evidence of race or gender discrimination, she must proceed under the burden-shifting analysis set forth in *McDonnell Douglas*.  In order to establish a prima facie case of disparate treatment, Titus must show that: (1) she is a member of a protected group; (2) she was subjected to an adverse employment action; (3) she was qualified for the position; and (4) similarly situated employees outside the protected group were treated more favorably. *Grace v. USCAR*, 521 F.3d 655, 677 (6th Cir. 2008).

14

Defendants do not dispute that Titus is a member of a protected group or that she was qualified for the position.  They argue, however, that she cannot show that she suffered an adverse employment action or that similarly situated employees outside the protected classes were treated more favorably.

### a.  Adverse Employment Action

In *Tepper v. Potter*, 505 F.3d 508 (6th Cir. 2007), the Sixth Circuit explained:

> A materially adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).  Such a change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities.  A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."

*Id.* at 515 (quoting *Ford v. General Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002)).

The Court agrees with Defendants that the vast majority of Titus's complaints of unfair treatment do not rise to the level of an adverse employment action for purposes of her discrimination claims.  Her strongest argument is that Defendants placed her on PIPs, which interfered with her opportunities for promotion and opportunities to earn higher wages.

In *White v. Baxter Healthcare Corporation*, 533 F.3d 381 (6th Cir. 2008), the Sixth Circuit explained that a negative performance evaluation may constitute an adverse employment action if the plaintiff can "point to a tangible employment action that she alleges she suffered, or is in jeopardy of suffering, because of the downgraded

15

evaluation." *Id.* at 402 (quoting *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 789 (6th Cir. 2000)).  More recently, the Sixth Circuit held that a final written warning which made the plaintiff ineligible for a promotion or raise for a one-year period constituted a "materially adverse change in the terms of his employment" regardless of whether the employee would have actually received a promotion during that period. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 348 (6th Cir. 2012).  *See also Goldfaden v. Wyeth Laboratories, Inc.*, No. 10-1799, 2012 WL 1676664, at **3-4 (6th Cir. May 14, 2012) (holding that the possibility that the plaintiff would have received a lower bonus as a result of a warning letter was sufficient to establish an adverse employment action for purposes of summary judgment motion).[7]

As Schultz explained, a Written PIP does not necessarily bar a promotion, but, as a general rule, employees with a Written PIP are not considered to be qualified for promotion for one year.  Schultz Decl. ¶ 20.[8]  In accordance with the above-cited cases, the Court finds that Titus has identified a tangible employment action that she has suffered, or is in jeopardy of suffering, as a result of the Written PIP.  The Court therefore finds that she has established a materially adverse employment action for purposes of her discrimination claims.

---

[7] Defendants' citations to *Agnew v. BASF Corp.*, 286 F.3d 307 (6th Cir. 2002), and *Keller v. Allstate Ins. Co.*, 146 F. App'x 764 (6th Cir. 2005) are unavailing.  The issue in those cases was whether poor performance reviews and placement on a PIP constituted "intolerable working conditions" supporting a claim of constructive discharge.

[8] While on the Written PIP, Titus did apply for, and was interviewed for, a Business Accounts Apprentice position.  This, however, was considered a lateral, entry-level position, not a promotion.  Allen Decl. ¶ 9.

### b.    Disparate Treatment

With respect to that adverse employment action -- the issuance of the Written

PIP -- Titus must also show that similarly situated employees outside the protected

classes were treated more favorably than she was.  Moreover, those employees must

be similarly situated to Titus in all relevant aspects.  *Ercegovich v. Goodyear Tire &*

*Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).  In this case, that means that Titus must

show that non-African-American employees or male employees with KPIs comparable

to hers were not given Written PIPs.

At her deposition, Titus testified that she believed that white males Jay Reynolds,

Rodney Hines, Sean Hall, Will Maples, and John Slack should have been given PIPs

but were not.  Titus Dep. at 506.  She has failed, however, to point to any admissible

evidence showing that these coworkers had KPIs that were similar to, or worse than,

Titus's during any particular time period.  In contrast, Defendants have submitted an

affidavit from Jay Reynolds stating that he received at least two PIPs for failing to meet

sales goals between late 2008 and mid-2009.  Reynolds Aff. ¶ 5.

In her memorandum in opposition to the motion for summary judgment, Titus

summarily states that "[o]ther employees in similar situations were excused from

performance guidelines.  See Exhibit 2 (see e.g. whites Kristin Plummer; Lauren Lux;

Andrew Jones, Elizabeth Guyton)."  Doc. #57 at 25.  She offers no further explanation

and no supporting documentation.  The Court assumes that the "Exhibit 2" that is

mentioned is actually "Attachment 2" to Gregory Allen's declaration.  Allen, the district's

Human Resources Consultant for Verizon, states that over 500 PIPs were issued in the

district between 2008 and 2011, and most of those were issued to whites and/or males. Allen Decl. ¶ 6.  Attachment 2 to his declaration is a compiled report of those PIPs.  It shows the employee's name, race, sex, store name, PIP reason, PIP type, and effective date.  The reasons listed for issuing the PIPs include "conduct," "attendance," and "performance."  Although most of the PIPs were issued for performance-related issues, the report gives no details of the employees' KPIs.  Again, Titus has presented absolutely no evidence of how the KPIs of Plummer, Lux, Jones or Guyton compared to hers.

Absent such evidence, Titus cannot show that these particular employees, or any others, were similarly situated to her in all relevant aspects or that they were treated more favorably than she was with respect to the issuance of the Written PIP.  Because Titus has failed to establish a prima facie case of discrimination based on either race or gender, the Court sustains Defendants' motion for summary judgment with respect to Count I.

## C.     Retaliation

Count II of Titus's Complaint alleges that Defendants retaliated against her, in violation of Title VII and Ohio Revised Code Chapter 4112, for having complained of race and gender discrimination to her district manager and to the EEOC.  *See* 42 U.S.C. § 2000e-3(a);  Ohio Revised Code § 4112.02(I).[9]

---

[9] The fact that the Court has dismissed the discrimination claims on the merits does not mean that Titus cannot prevail on her retaliation claim.  She need only demonstrate that she had a good faith, reasonable belief that the conduct about which she complained violated Title VII. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579

As an initial matter, the Court notes that Titus makes very little effort to develop this retaliation claim, or to defend against Defendants' motion for summary judgment on that claim.  In her memorandum in opposition to the motion for summary judgment, she states only that "[t]here was [sic] multiple events giving rise to retaliation damages starting in Beavercreek, followed by the meeting with Schultz in January 2010, the filing of the EEOC a for [sic] weeks later and the filing of the lawsuit later that year."  Doc. #57, at 37.

Titus has presented no direct evidence to support her claim of retaliation and is, therefore, once again subject to the *McDonnell Douglas* burden-shifting framework.  A plaintiff may establish a prima facie case of retaliation by showing that: (1) she engaged in Title VII-protected activity; (2) the defendant knew that she engaged in the protected activity; (3) the defendant subsequently took an adverse employment action against her; and (4) the adverse action was causally connected to the protected activity. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

There is no doubt that Titus engaged in activity protected by Title VII.  She complained to Ryan Favor in May of 2009 about the PIPs and about Holley's statement that she and Meadors did not "fit with the team."  Then, in January of 2010, she met with Schultz about the alleged unfair treatment.  Filing an internal complaint of discrimination constitutes protected activity under Title VII.  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).[10]  In January of 2010 and September of

_____

(6th Cir. 2000).

[10] Defendants maintain that because the complaints to Favor and Schultz did not involve allegations of gender or race discrimination, they do not constitute protected

2011, Titus filed charges of race discrimination, gender discrimination, hostile work environment and retaliation with the EEOC. This is also protected activity under Title VII. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000).

It is also undisputed that Defendants knew that Titus took these steps to protect her civil rights. As the recipients of her internal complaints, Favor and Holley knew of her protected activity in May of 2009, and Schultz in January of 2010. Verizon learned of the first EEOC charge late afternoon on March 8, 2010, McCandless Decl. ¶ 3, and of the second EEOC charge on October 21, 2011, Suits Decl. ¶ 3.

The first and second prongs of the prima facie case are therefore satisfied. Titus must also present sufficient evidence from which a reasonable jury could find that Verizon subsequently took an adverse employment action against her and that it was causally connected to the protected activity. Even though she has presented evidence of a subsequent adverse employment action, Titus has failed to show the requisite causal connection.

As the parties acknowledge, the Supreme Court has held that the burden of establishing an adverse employment action in the context of a retaliation claim is less onerous than it is in the context of a discrimination claim. In a retaliation claim, a plaintiff need show only that the action "well might have dissuaded a reasonable worker

———————————————

activity. The Court, however, is required to view the evidence in the light most favorable to Titus. Meadors has testified that she told Favor that she and Titus were the only two African-American females in store and asked why they needed to be off the team. Meadors Aff. ¶ 10. This gives rise to an inference that the complaint to Favor did involve allegations of gender and race discrimination. Moreover, Titus testified that she told Schultz about the racial and sexual discrimination she felt she had experienced. Titus Dep. at 519-21.

from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). "[P]etty slights, minor annoyances, and simple lack of good manners" do not normally rise to this level, although "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.*

Titus maintains that after she complained to Favor of unfair treatment in May of 2009, Holley retaliated against her in June of 2009 by asking Wingham to coach her for one day regarding mobile broadband sales. Titus Dep. at 280, 287. The Court agrees with Defendants that, even with the less onerous standard applicable to retaliation claims, this does not constitute an adverse employment action since it would not dissuade a reasonable employee from filing a charge of discrimination.

Titus also maintains that Defendants retaliated against her by placing her on PIPs, thereby limiting her opportunities for advancement and transfer. Assuming that placement on a PIP constitutes an adverse employment action in the context of a retaliation claim, Titus cannot establish the requisite causal connection. It is undisputed that the February 2009 Verbal PIP and the May 2009 Written PIP were both issued before Titus engaged in any protected activity. Moreover, even though Titus interviewed for the Business Accounts Apprentice position in February of 2010, while her Written PIP was still active, it is undisputed that the relevant decision-maker, John Rardin, did not know about her Written PIP or the EEOC charges when he decided to hire a different candidate. Rardin Decl. ¶ 3. Therefore, Titus cannot establish the requisite causal connection.

The August 2011 Verbal PIP was issued by Kathryn Sparks, her store manager at Centerville, more than two years after Titus lodged her internal complaint with Favor,

21

a year and a half after she lodged her internal complaint with Schultz, seventeen months after Defendants learned that she had filed her first EEOC charge, and nine months after the lawsuit was filed.  There is no temporal proximity and Titus has pointed to no other evidence of a retaliatory motive for issuing that Verbal PIP.  *See Nguyen v. City of Cleveland*, 229 F.3d 559, 566-67 (6th Cir. 2000) (noting that the Court has generally found temporal proximity to exist only when the alleged retaliation occurs within six months of the protected activity).

Sparks explained that she issued the Verbal PIP under the mistaken belief that Titus's rolling 3-month KPI average had fallen below 90%.  That same month, she also miscalculated the averages for several other employees, and was reprimanded for it. The miscalculations for those employees were caught before any other PIPs were issued.  Sparks Decl. ¶¶ 2-4.  Titus's Verbal PIP was rescinded as soon as the error was discovered, but not before she interviewed with Sparks for the SRSR position at the Centerville store.  Sparks has stated, however, that the Verbal PIP played no part in her hiring decision.  *Id.* at ¶ 6.  She hired Nick Butler for the SRSR position because he was better qualified.  *Id.* at ¶ 15.[11]  Titus has presented no evidence to the contrary. Based on the evidence presented, no reasonable jury could find that Sparks had a retaliatory motive for issuing the Verbal PIP to Titus, or for failing to hire her for the SRSR position.

---

[11]  Defendants further note that Titus has argued that Nick Butler was "preselected" for this position before it was ever posted.  This argument appears to be incompatible with her allegation that she was not selected for the position because she had engaged in protected activity.

Because Titus has failed to establish the requisite causal connection, the Court concludes that she has failed to establish a prima facie case of retaliation.  Accordingly, the Court sustains Defendants' motion for summary judgment on this claim.

### D.     Hostile Work Environment

Count III of Titus's Complaint alleges that, during the time Holley was her supervisor in Beavercreek, she was subjected to unwelcome harassment based on her race and gender.  She maintains that she was consistently treated unfairly, was placed at a competitive disadvantage, and was subjected to discipline and coaching far more often than the white, male RSRs, thereby interfering with her ability to excel at her job and to pursue opportunities for advancement.  She alleges that she suffered severe anxiety just knowing that Holley did not want female African-American sales representatives on his staff.

### 1.     Prima Facie Case

In order to establish a prima facie case of hostile work environment, Titus must demonstrate that: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her race or gender; (4) the harassment unreasonably interfered with her work performance by creating an environment that was intimidating, hostile, or offensive; and (5) the employer is subject to liability.  *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999).  The basis for employer liability varies slightly depending on whether the alleged harasser is a coworker or a supervisor.  Here, Titus alleges that Holley, who was her supervisor,

23

along with other store managers, created a hostile work environment.  She must, therefore, prove that the managers' harassing conduct was foreseeable or fell within the scope of their employment, and the employer failed to respond adequately and effectively.  *Id.*

Defendants argue that Titus cannot satisfy the third, fourth, or fifth elements of a prima facie case.  The Court disagrees.

Defendants first argue that none of the alleged harassment was based on race or gender.  It is true that Titus's allegations do not fit the mold of a typical hostile work environment claim.  She does not allege that she was subjected to any explicit racial slurs, physical threats, sexually offensive language, or unwanted physical contact.[12] This, however, does not foreclose a hostile work environment claim.

The Sixth Circuit has held that "[c]onduct that is not explicitly race-based may be illegally race-based and properly considered in a hostile-work-environment analysis when it can be shown that but for the employee's race, she would not have been the object of harassment."  *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007).  In *Clay*, the plaintiff did not claim that she was subjected to any racial slurs or racially offensive conduct.  Rather, she argued that her supervisor singled her out for discipline because of her race.  She presented affidavits showing that although she and

---

[12]  Meadors stated that "Luke Holley, Shaun Whitman [sic] and other white males were [sic] made comments talking ghetto to me, and often made statements like "Black females are smart mouthed," "country ass democrats," have "messed up families," "you people usually don't get jobs like this," and "black [sic] are mostly on welfare and food stamps."  Meadors Aff. ¶ 16.  But because there is no evidence that Titus was aware of these comments made to Meadors, she cannot rely on this evidence to support her own hostile work environment claims.  *Armstrong v. Whirlpool Corp.*, 363 F. App'x 317 (6th Cir. 2010).

her white coworkers had engaged in the same conduct, she was disciplined for it and they were not. The Sixth Circuit held that this "created an inference, sufficient to survive summary judgment, that race was the motivating reason behind [the supervisor's] behavior." *Id.* at 707.

The Court agrees with Defendants that Titus has failed to present sufficient evidence from which a reasonable jury could find that, but for the fact that she is a woman, the alleged harassment would not have taken place. It is undisputed that there were several women working at the Beavercreek store, and Titus has pointed to no specific evidence showing that they, as a group, were generally treated less favorably than their male coworkers.

Holley's isolated comment that if Titus was "not on board," he had "guys in line" to replace her is not enough to raise an inference of a gender-based discriminatory animus. Titus Dep. at 391. Likewise, comments of unnamed female coworkers referring to Verizon as a "sausage club" and expressing their personal belief that women did not stand a chance in that sales district, *id.* at 419-20, 730, are insufficient to create a genuine issue of disputed fact concerning whether, but for her gender, Titus would not have been subjected to the alleged harassment. Therefore, to the extent that Titus alleges a hostile work environment based on gender, the Court concludes that Defendants are entitled to summary judgment on this claim.

The same is not true for Titus's allegations of a racially hostile work environment. She has presented evidence that she and Meadors, the only two African-American females in the store, were singled out by Holley for additional coaching and discipline, and generally treated less favorably than the white RSRs. Titus testified that, in

25

contrast to the white RSRs, she was not given warm business leads, was regularly assigned unfavorable work stations at the back of the store, and was not entrusted with manager codes.  On at least one occasion, she was marked tardy when white employees who arrived even later were not.  As in *Clay*, the Court finds that this evidence is sufficient to create a triable issue of fact as to whether the alleged harassment would have occurred but for Titus's race.

In order to proceed with her claim of a hostile work environment based on race, Titus must next show that the alleged harassment unreasonably interfered with her work performance by creating an environment that was intimidating, hostile, or offensive.  It "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993)).

In *Harris*, the Supreme Court held that a hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  510 U.S. at 21.  The Court noted that, in determining whether an environment is "hostile" or "abusive," courts must examine the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* at 23.

In this case, Titus does not argue that any of the harassment was severe in nature. She does not allege that any racially offensive language or conduct was ever directed at her. Nor does she allege that she was ever physically threatened or humiliated. According to Titus, however, the alleged harassment was pervasive. Titus contends that she was consistently subjected to unfair treatment.

As previously noted, she testified that Holley discouraged her coworkers from interacting with her. Her managers almost always assigned her to undesirable work stations at the back of the store, regularly diverted "good traffic" away from her, and failed to give her warm sales leads. Her sales were sometimes wrongfully credited to stores outside of her district, negatively affecting her KPI scores. She further testified that she was subjected to far more frequent disciplinary coaching than white employees, and was marked tardy when they were not.

In addition, despite Titus's repeated expressions of interest in management, Defendants apparently did little to help nurture her leadership skills. She testified that temporary manager codes were given to white employees but not to her, and she was not assigned Champion Roles. Although she applied for other jobs and was granted a couple of interviews, white employees were hired instead.

Viewed in isolation, these incidents may not appear to amount to much. But as the Sixth Circuit explained in *Williams*, in analyzing a hostile work environment claim, the court must consider the accumulated effect of the alleged incidents of harassment rather than viewing each episode in isolation. 187 F.3d at 563.

By its very nature, Titus's line of work is extremely competitive. Sales figures are the key to success and open the door to opportunities for advancement. When an employee is consistently denied an equal opportunity to interact with customers, this could easily have a negative impact on sales figures and on that employee's eligibility for promotions. In the Court's view, under the circumstances presented here, a reasonable person could find that the alleged harassment and unfair treatment was sufficiently pervasive to alter the terms of Titus's working environment.

Defendants maintain that Titus has not shown that the alleged harassment impaired her ability to do her job. They note that she consistently received satisfactory performance evaluations and usually achieved her sales goals. Schultz Decl. ¶ 19. The question, however, is not whether her productivity declined as a result of the harassment, but rather whether the harassment made it more difficult for her to do the job. *Williams*, 187 F.3d at 567. Again, keeping in mind that sales leads, referrals and opportunities to interact with customers are crucial to meeting sales goals, it is reasonable to believe that the alleged harassment made it more difficult for Titus to fulfill her job responsibilities.

The Court therefore concludes that a reasonable person could find Titus's work environment to be objectively hostile or abusive. Moreover, from a subjective standpoint, it is clear that Titus perceived it to be so. She complained about the unfair treatment to Favor. When nothing was done to alleviate the problem, she asked to be transferred from Beavercreek to Centerville. Later, when an opening for a SRSR was posted for the Beavercreek store, she refused to apply for it because she did not want to return to that environment. She later complained about the unfair treatment to

Schultz, and filed charges of discrimination with the EEOC, followed by this lawsuit.

In addition, Titus testified that going into work is very stressful. She does not sleep well, has little appetite, and is being treated for severe headaches, anxiety and depression. Titus Dep. at 695-712. The Court finds that Titus has presented sufficient evidence from which a reasonable jury could find that the alleged harassment was pervasive enough to alter the conditions of her employment, or unreasonably interfere with her work performance.

Finally, Titus must show that the challenged conduct fell within the scope of the supervisors' employment and that Verizon failed to respond adequately and effectively. Here, it is clear that the alleged harassment took place within the scope of the supervisors' managerial authority. Defendants argue that because Titus took no action to report the alleged harassment, they cannot be held liable for failing to respond adequately and effectively. It is undisputed, however, that Titus complained about the unfair treatment to Favor in May of 2009 and again to Schultz in January of 2010. As noted earlier, although Favor and Schultz deny that Titus complained that she was being treated unfairly because of her *race*, Titus has presented evidence to the contrary, creating a genuine issue of disputed fact as to this issue. According to Titus, Favor and Schultz took no action to address the alleged discriminatory treatment. A reasonable jury could find that Verizon failed to respond adequately and effectively.

The Court therefore finds that Titus has established a prima facie case of hostile work environment based on race.

## 2.    Legitimate, Non-Discriminatory Reasons

The burden now shifts to Defendants to articulate legitimate, non-discriminatory reasons for the alleged harassment.  As to the frequent coaching, Holley maintains that all RSRs were regularly coached and counseled about common problems, and that he asked Wingham to coach Titus on broadband sales because, at that time, the sales goal was 10 aircard activations and Titus had none.  Holley Dec. ¶¶ 7-8, 12.

As to the first two PIPs, Defendants maintain that these were warranted based on company guidelines and Titus's KPIs.  Defendants admit that the August 2011 Verbal PIP was issued erroneously, but note that it was rescinded as soon as the calculation error was discovered.  Sparks Decl. ¶ 3.

With respect to the customer referrals and business leads, Defendants argue only that there are sometimes legitimate reasons to refer a particular customer to a particular RSR.  They maintain that managers take turns giving the RSRs warm business leads, but may give more leads to those RSRs who follow up and close the deal.  According to Holley, Titus did not follow up on the leads that were given to her. Holley Decl. ¶¶ 10-11.  Defendants maintain that a computer glitch is the likely reason why some of Titus's sales were attributed to other stores.  Schultz Decl. ¶ 17.

As for the alleged failure to provide training and opportunities for advancement, Defendants argue that even though Titus expressed a general interest, she took no initiative to volunteer for Champion Roles.  Defendants explain that manager computer codes were typically given to Customer Service Representatives, who do not work on commission, or to SRSRs.  Schultz Decl. ¶ 18.  They contend that because Titus did not formally apply for the management in training program, she was not considered for

participation in it. Maccombs Decl. ¶ 4.

The Court finds that Defendants have met their burden of production. The burden therefore shifts back to Titus to prove, by a preponderance of the evidence, that the proffered reasons are pretextual.

### 3. Pretext

As noted earlier, Titus may prove pretext by showing that: (1) the proffered reasons have no basis in fact; (2) the proffered reasons did not actually motivate the challenged conduct; or (3) the proffered reason was insufficient to motivate the challenged conduct. *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 546 (6th Cir. 2008). Although not entirely clear, Titus appears to be proceeding largely under the second theory. As explained in *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078 (6th Cir. 1994), under this theory,

> the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

*Id.* at 1084.

In this case, Titus has presented considerable evidence in support of her claim of pretext. In particular, she has presented evidence from which a reasonable jury could find that Holley was racially biased. His statement that Titus and Meadors did "not fit with the team" and should be kicked off raises an inference that they were singled out and treated less favorably because they were African-American. Evidence that, when confronted by Favor, he denied making this statement, yet later yelled at

31

Barnes for disclosing this statement to Meadors, raises a further inference that he knew that it was inappropriate and was trying to cover up his racial animus. In addition, Titus has averred that, in her presence, Holley greeted a fellow employee "in a stereotyped black ghetto accent" with the phrase "What up dawg?" Titus Aff. ¶ 6. She also testified that she heard Holley refer to another African-American employee as "a piece of poop that should have been flushed long ago." Titus Dep. at 322-37.

Holley maintains that he brought Wingham in to coach Titus and Meadors on broadband sales because, in June of 2009, RSRs had a goal of 10 aircard activations and, as of June 11, 2009, Titus and Meadors had none. Holley Decl. ¶ 7. However, white RSR Joseph Hogan also had zero aircard activations as of that date, and there is no evidence that Wingham was asked to coach him. See Attachments 1 and 2 to Holley Decl.; Titus Dep. at 280-81. This again, gives rise to an inference of discriminatory treatment.

Finally, Titus has presented statistics that tend to show that, within this particular sales district, there are very few, if any, African-Americans in management positions. This gives rise to an inference of a "glass ceiling," and could explain Defendants' alleged efforts to thwart Titus's quest to advance within the company.

The Court finds that Titus has presented sufficient evidence from which a reasonable jury could find that Defendants' proffered reasons did not actually motivate the challenged conduct. The Court therefore overrules Defendants' motion for summary judgment on Titus's claim of a hostile work environment based on race.

## IV.    Conclusion

For the reasons set forth above, the Court SUSTAINS IN PART AND OVERRULES IN PART Defendants' Motion for Summary Judgment (Doc. #47). Defendants are entitled to summary judgment in their favor on Titus's claims of race and gender discrimination, retaliation, and a hostile work environment based on gender. The Court, however, finds that genuine issues of material fact preclude summary judgment on Titus's claim of a hostile work environment based on race.

Counsel of record will note that a telephone conference call will be convened between the Court and counsel at 11:00 a.m. on October 4, 2012, for the purpose of discussing further procedures to be followed in moving this litigation to a conclusion.


Date:  September 17, 2012

WALTER HERBERT RICE
UNITED STATES DISTRICT JUDGE


Copies to:

Counsel of record

33